| **SWORN DECLARATION** | State of Louisiana | Parish of Orleans |

1    I, Ricky J. Rauch, Sr., an employee of the U. S. Department of Homeland

2    Security, Immigration and Customs Enforcement, make the following sworn

3    declaration, under penalty of perjury, with regard to the claim of employment

4    discrimination identified below:

5    *Issues: Whether I discriminated against on the bases of national origin (Hispanic),*

6    *age (48, Date of Birth: May 13, 1954) and reprisal for prior EEO activity, when in July 2003,*

7    *I was given the option of being reassigned to the position of Operations Staff Officer, GS-*

8    *1803-13, Washington, DC (amendment 1); and,*

9    *Whether I was discriminated against on the bases of national origin (Hispanic),*

10    *age (49, Date of Birth: May 13, 1954) and reprisal for prior EEO activity, when in July 2003,*

11    *I was asked to turn in my credentials, badge, equipment, gear, and employee manuals*

12    *(amendment 1).*

13    **Please identify yourself for the record:**

14    Response: I am a Grade 13, Series 1801 Supervisory, Marine

15    Enforcement Officer (SMEO) with the Department of Homeland Security-

16    Immigration and Customs Enforcement (ICE). I have been in my current position

17    for over two years; prior to that I was a Senior Marine Enforcement Officer. I have

18    been employed with Immigration and Customs Enforcement (formerly Immigration

19    and Naturalization Service) for approximately 16 years.

20    I am Hispanic and my date of birth is May 13, 1954. I have prior

21    involvement in the Equal Employment Opportunity (EEO) process-but only as it

22    pertains to circumstances which were also related to this case.

Page 1 of 21            Initials

23      Question: Were you serving in this role as of May 2003, the date of the alleged

24      discrimination?

25      Response: Yes, I was.  Many discriminatory and retaliatory issues involved

26      in my EEO case, and involving my on-duty injury (OWCP case) occurred before

27      July 2003.  It is my understanding that my responses to this document involve

28      issues that occurred on and after July 2003.

29      Question: As it relates to the above issues, who are you claiming discriminated

30      against you?

31      Response:  Fred Coover and those senior supervisors and employees

32      working on his behalf and/or influenced by his defamation and destruction of my

33      character.

34      Question: What is your professional relationship with Nicholas Doucet and the

35      duration of that relationship?

36      Response: Prior to Nicholas Doucet working under the direct supervision

37      of Fred Coover, my professional relationship with Nicholas Doucet was very

38      good.  Mr. Doucet and I worked together at Headquarters in Washington when I

39      was detailed there, working for Charles Stallworth (who awarded and

40      commended me for my excellent work).  During that time, Mr. Doucet and I

41      shared a good professional relationship and we never had disagreements,

42      confrontations, or unpleasantness.  Our professional working relationship was

43      sound.  During non-working hours we often sought each other's company socially

44      for lunch, dinner and other social meetings.

Initials

(42)

45        My relationship with Mr. Doucet became strained when he came to work

46      directly under Fred Coover's supervision.  Mr. Doucet and I now have a very

47      strained working relationship.

48        During my final meeting with Mr. Doucet, my wife (on my behalf) asked Mr.

49      Doucet if he recollected our previous excellent professional and social

50      relationship.  Mr. Doucet replied that he did remember it.  Upon leaving, Mr.

51      Doucet told me that Fred Coover was going to work in another location and that

52      once Coover was gone, things would be much better for me at the Branch.  My

53      wife and my adult son were both witnesses to Mr. Doucet's remark.  We all

54      interpreted this comment to mean that Mr. Doucet also believed that Fred Coover

55      was the cause of the problems between us.

56      **Please describe your major job duties, functions and responsibilities in the**

57      **position of SMEO.**

58      <u>Response</u>: My major duties, functions, and responsibilities as a

59      Supervisory Marine Enforcement Officer are all part of my personnel records and

60      the EEO case records.  Anyone who is in a position to determine the validity of

61      my EEO claim MUST review BOTH of my Position Descriptions before any

62      decisions are made.  They MUST review my Position Description BEFORE and

63      AFTER the one-line change was made.  The firm facts are that my Position

64      Description NEVER contained "the ability to function on board vessels".  My

65      Position Description was changed AFTER my on-duty spinal injuries occurred.  I

66      believe senior management was influenced by Fred Coover's constant

67      defamation of my character (and/or those working on his behalf).  Mr. Coover's

          Initials

(43)

68    negative influence and his insinuations to senior management that I was "faking"

69    brought about this one-line change in my Position Description.  Since there are

70    only a handful of Supervisory MEO's employed by Customs, this change would

71    not negatively impact the other SMEO's.  It would only negatively impact an

72    SMEO who suffered similar spinal injuries and had similar physical limitations.

73    This change was done to target me because of my on-duty spinal injuries and his

74    personal dislike of me.

75        **Please describe in chronological order the sequence of events leading up to your**

76    **being given the option of a directed reassignment to the position of Operations Staff**

77    **Officer (OSO) in Washington, DC.**

78        Response:  It should be noted that in my prior EEO activity (involving Fred

79    Coover) Mr. Coover would not assign many of the above-mentioned supervisor

80    duties to me.  However, that 'ability to perform duty on board vessels IS NOT

81    LISTED IN MY CRITICAL ELEMENTS.  In the same vein, my original Position

82    Description DID NOT require the ability to perform duty on board vessels.  It

83    required knowledge of the law enforcement processes aboard vessels.

84        In response to the question, my Position Description was changed AFTER

85    my on-duty spinal injury occurred.  It was changed from 'knowledge' to 'ability'.

86    Since my on-duty spinal injuries caused my medical team to temporarily prohibit

87    my work on board the vessels, the new change to my Position Description had a

88    negative impact on me.  There are only a handful (approx. 5) SMEO's in the

89    Service who share my Position Description.  Unless they had a similar spinal

90    injury and related physical limitation, this would not negatively impact them.  I

Initials

(44)

91    believe I was targeted by Fred Coover, and/or those acting on his behalf and/or

92    those in authority influenced by Mr. Coovers' discrimination, retaliation, personal

93    prejudices and dislikes.

94    THE LETTER I RECEIVED STATED THAT BECAUSE OF MY ON-DUTY

95    PHYSICAL LIMITATIONS, I WAS BEING ISSUED A DIRECTED

96    REASSIGNMENT TO WASHINGTON. Fred Coover, and senior management

97    influenced by him, did this to target me.

98        **Question: What reason(s) were you given, and by whom, for being offered the**

99    **option of a directed reassignment to the position of OSO in Washington?**

100        Response: The reason of my physical limitations was used by Charles

101    Stallworth, under the influence of Fred Coover's discriminatory and retaliatory

102    feelings toward me. The following background information supports this.

103        My on-duty spinal injuries temporarily prevented me from functioning on

104    board vessels. My peers and supervisors told me that Fred Coover thought I was

105    faking my injury and for them to "watch me." Although, he was aware of my injury

106    and limitations, he gave additional orders for me to perform work on board an

107    interceptor vessel traveling at high speeds in rough, high seas. The extreme

108    pounding of the boat caused further spinal injuries. I was in severe pain, needed

109    more prescriptive pain medication and experienced further limited mobility.

110        I was unable to get relief from this hostile work environment caused by

111    Fred Coover and it was getting worse. In desperation, I set up a meeting with

112    Charles Stallworth at headquarters in Washington. I had previously worked

113    closely with Mr. Stallworth and he had awarded and commended me for my good

Initials

45

114    work. We had enjoyed a good professional relationship. I hoped to receive

115    assistance from him to relieve the hostile work environment caused by Fred

116    Coover.

117        However, in my meeting with Mr. Stallworth, it became evident that

118    someone had changed Mr. Stallworth's previously good opinion of me. He now

119    appeared irritated and agitated toward me. He implied that he had been told my

120    injury was made up to avoid transfer to San Diego. He told me 'why don't you

121    just suck it up and be a team player?" His change in behavior toward me and his

122    implication that I was not a team player confirmed to me that someone had

123    influenced him. I believe Fred Coover poisoned Mr. Stallworth's perception of

124    me through negative and slanderous statements about me which influenced many

125    employees at levels above and below Mr. Coover.

126        Many months prior to this, I was told that employees from AMID New

127    Orleans, acting on Fred Coover's behalf, had made slanderous statements

128    against my character to employees in Mr. Stallworth's office. Fred Coover reports

129    directly to Mr. Stallworth. I believe Fred Coover, and/or those working on his

130    behalf, methodically and systematically destroyed my professional character to

131    my peers, my supervisors and to Mr. Stallworth. I believe this influenced the

132    change that was made to my Position Description.

133        Nicholas Doucet, acting on Fred Coover's behalf, began to have

134    unannounced meetings with me regarding my inability to perform on board the

135    vessels. During these meetings, Mr. Doucet informed me that my Position

136    Description had changed and it now required me to perform duties on board

Page 6 of 21                                    Initials

(46)

137   vessels. He told me that unless I could perform vessel duty, I would receive

138   'Unsatisfactory' ratings. He did this verbally and in writing. I perceived this to be

139   a direct threat to my career and any chances I might have for promotion.

140      At a later date, Mr. Doucet handed me the undated letter from Mr.

141   Stallworth ordering a directed reassignment because of my inability to perform

142   duty on board vessels. In this letter Mr. Stallworth stated that since I was unable

143   to perform in an operational capacity aboard vessels, I was being given a directed

144   reassignment to the Washington area. Mr. Stallworth's letter outlined 3 options

145   for me if I declined the directed reassignment. These options were 1) Disability

146   Retirement 2) Resignation from the Service 3) Removal from federal service. My

147   attorney and I both personally responded to Mr. Stallworth's letter (on file). Yet,

148   we have had no response from Mr. Stallworth regarding our letters.

149      At the time of this directed reassignment, I was physically able to perform

150   all of my job duties and responsibilities. At the time I was selected for this

151   position, duty on board vessels was not a job requirement in my Position

152   Description. It was not listed as a Critical Element then or now. It should be

153   noted that after my injury, I received successful ratings for performing my job,

154   even though I was not able to perform duty on board the vessels. If my physical

155   limitations truly prevented me from performing the functions of my job, I would not

156   have been rated 'Successful'. Fred Coover, and/or those working on his behalf

157   and or those influenced by him, later began using this physical limitation as a

158   means to target me and get rid of me.

Initials

(47)

159     Question: As of the date you were given the option of a directed reassignment

160     (July 2003), were you physically able to perform all of your job duties and responsibilities,

161     specifically, operating aboard vessels? If not, describe any limitations you had/have.

162     Response: This question assumes that it was always my job requirement

163     to function on board a vessel. It was not. The question should be restated for

164     accuracy as it pertains to this case. At the time of the directed reassignment, I

165     was temporarily unable to perform duty on board vessel. However, I performed

166     all aspects of my job and was rated "successful" and awarded for it.

167     Question: As it relates to the preceding question, at the time you were given the

168     option of a directed reassignment, how long had you been unable to perform your job

169     function of operating aboard a vessel?

170     Response: This question assumes that it was always my job requirement

171     to function on board a vessel. It was not. The question should be restated for

172     accuracy as it pertains to this case.

173     Question: Do you have medical documentation that specifically details your

174     medical condition and/or that describes and outlines your limitations? If so, briefly state

175     what it says?

176     Response: Information detailing my medical condition and outlining my

177     limitations is well documented in my supervisor's files, the EEO case file and the

178     OWCP case file. My physicians and surgeons have provided additional medical

179     documentation. Diagnostic testing such as MRI, XRAY, etc. and prescription pain

180     medications are all part of my case files. To my knowledge, my diagnosis is

181     herniated cervical disk. I have provided written documentation regarding all of

182     this.

Page 8 of 21                                      Initials



183    Question: As it relates to the preceding question, has this medical information

184    been shared with your employer? If so, when and with whom?

185    Response: Yes. All my supervisors are aware of the information.

186    Question: Since May 2003, have you requested reasonable accommodations from

187    your employer? If so, what accommodation(s) did you request and when? Was the request

188    in writing or verbal?

189    Response:   Reasonable accommodation for the on-duty injury was never

190    offered to me by my supervisors.  I made a verbal request for reasonable

191    accommodation to Mr. Doucet. The reasonable accommodation I requested was

192    limited physical work.  When the change was made to my Position Description, it

193    then included limitation of working on board vessels, etc. I was able to sit at my

194    desk and do my supervisory work, I just was not able to work on board vessels..

195    Mr. Doucet, acting on Fred Coover's behalf, verbally responded that I would not

196    be allowed reasonable accommodation.  In other words, it was made clear to me

197    by my supervisors that if I could not perform the job they wanted me to perform,

198    then I was not going to be accommodated in any way, shape or manner.

199    Because of his negative response, I was intimidated into not pursuing a written

200    request and discouraged that I would not receive reasonable accommodation.

201    Question: As it relates to the preceding question, if you requested an

202    accommodation, was it granted? If it was not granted, what reason(s) was/were you given

203    for the accommodation not being granted?

204    Response: Mr. Doucet, acting on Fred Coover's behalf, replied "I want you

205    out on the boats."

Initials

(49)

206          Question: If you have not requested an accommodation, why not?

207          Response: I answered this in my narrative above.

208          Question: In addition to the option of a directed reassignment to the position of

209     OSO in Washington, what other options were you offered? Were any of these options

210     feasible? Why or why not?

211          Response: I answered this above. In addition, please refer to my

212     response (on file) to Mr. Stallworth's letter. The answer to this question is there.

213     None of the options offered were feasible. I was given the options of disability

214     retirement, resignation from Service or removal from federal Service. I was not in

215     a position to know if disability retirement was an option. I did not want to resign

216     because I believed I am an asset to the Service and my loyalties lie with the

217     Service and I did not want to resign. The final option of removal, pretty much

218     speaks for itself. I had a distinguished career and I did not consider removal an

219     option.

220          Please respond to management's claim that you were given a directed

221     reassignment based on information from your physician(s) that you were unable to

222     perform in an operational capacity aboard vessels.

223          Response: I believe Mr. Stallworth was influenced by Fred Coover's

224     personal prejudices and dislike of me. Fred Coover made slanderous statements

225     and insinuations about me to my supervisors and my peers. This negative

226     influence brought about decisions from management regarding the cancellation of

227     my GS13, SMEO position at the Gulfport office, the change in my Position

Page 10 of 21                                             Initials

(50)

228    Description, and the failure to offer me reasonable accommodation on my on-duty

229    injuries and limitations.

230          Question: At the time you were given the option of a directed reassignment, were

231    you able to perform in an operational capacity on board vessels. If so, at what capacity.

232    Please explain. If you were unable to perform in an operational capacity aboard vessels,

233    how long had you been unable to do so? How long did you expect to be incapacitated?

234    What is your current status?

235          Response: I answered most of this question above.  My physical limitations

236    caused by my on-duty injury were made worse by Fred Coover's opinion that I

237    was 'faking.'  Instead, he assigned me to additional vessel duties that he knew

238    were against my doctor's orders.  He also knew that my physical limitations were

239    temporary and that they were not a major part of my job responsibilities.  My

240    current status is that my spinal surgery is planned for Thursday, January 29,

241    2004, pending approval from Department of Labor.

242          In lieu of being given the option of a directed reassignment, please explain what

243    you believe should have occurred under the circumstances in your situation. State why

244    you believe your situation should have been handled in the manner described.

245          Response: I believe I should have been granted the reasonable

246    accommodation of not have to work on board vessels. I believe Fred Coover

247    should not have discriminated and retaliated against me.  I believe that my

248    successful work record and experience should have been considered.  Duty on

249    board vessels was never part of my Position Description, yet management used

250    this to target me.

Initials

51

251     Question: As it relates to the preceding question, what agency policy, regulations,

252     directives, etc., are you relying on to substantiate your response.

253     Response: Employees rights under OWCP regulations and employee's

254     rights for equal and fair treatment.

255     Question: During the months of February or March 2002, did you request and were

256     you selected for transfer to a position to the San Diego Air and Marine Branch? Why did

257     you request a transfer to the San Diego Air and Marine Branch?

258     Response: I requested a transfer to the San Diego Air and Marine Branch.

259     I did this in an effort to escape the hostile work environment caused by Fred

260     Coover's discriminatory and retaliatory actions against me and his personal

261     prejudices and dislike of me. I was hoping for an environment of equal

262     opportunity.

263     Please respond to management's claim that you stated you applied for the

264     position at the San Diego Air and Marine Branch in order to avoid a possible directed

265     reassignment to the Puerto Rico Air and Marine Branch.

266     Response: My reason for applying for the position at the San Diego Air and

267     Marine Branch was to escape the hostile work environment caused by Fred

268     Coover's discriminatory and retaliatory actions against me and his personal

269     prejudice and dislike of me. I felt another office such as the San Diego Air and

270     Marine Branch would offer me the equal opportunity I deserved. In retrospect, I

271     see that an employee should not have to 'escape' a hostile supervisor. A

272     supervisor should be held to the high standard of equal opportunity for all.

Initials

52

273     Management, particularly Fred Coover is well aware that I had to

274     continually ask and later demand the supervisory duties for which I am salaried.

275     It was common knowledge among the other supervisors and my peers that Fred

276     Coover initially refused to give me any supervisory duties.  He was not willing to

277     afford me the same opportunities he gave other employees who held my position

278     thus limiting my supervisory experience.

279     I demonstrated my willingness to work at the Puerto Rico Air and Marine

280     Branch when I worked at that office for 2 months.  I do not recall telling anyone

281     that I applied for the San Diego position to escape directed reassignment to

282     Puerto Rico Air and Marine Branch.

283     **Question**: To your knowledge, what was to happen with the position you vacated?

284     Was it to be filled, eliminated, etc?  Please explain.  Were you ever told there was no need

285     to have two people/a person in the position of SMEO AMID New Orleans-Gulfport?

286     Explain.     **Response**:   Nicholas Doucet told me that my job was being

287     cancelled because it was no longer needed. I find this unsettling because the

288     AMID New Orleans-Gulfport Office had a GS-13 SMEO prior to me being there. It

289     was held by the same SMEO GS-13 in which Mr. Coover showed favoritism (as

290     described elsewhere in this document). It was only after this employee was

291     transferred to another position and I was selected (by Headquarters) that Mr.

292     Coover, or those in management who are influenced by his recommendations,

293     decided to cancel my position. After this GS-13 SMEO transferred out of our

294     office, I was at the GS-13 SMEO position with no supervisory duties. I asked Mr.

295     Doucet about his plans for me as a supervisor. I had hoped that since the other

Page 13 of 21                                    Initials _AK_

(53)

296    SMEO-13 was being transferred that I would be afforded the opportunity to

297    function as a supervisor when this employee left. Instead, Mr. Doucet, acting on

298    Mr. Coover's behalf, told me that they did not plan to do this because "local

299    management wanted to evaluate me further." I asked for clarification on this

300    since I had been a GS-13 SMEO for over a year and I surpassed the standard

301    probationary year for evaluations and I had been rated "Successful" during that

302    time period. Mr. Doucet, acting on Fred Coover's behalf said they just wanted to

303    "take another look at me." I told Mr. Doucet that if local management had some

304    type of problem with my performance they should put this in writing and allow me

305    the opportunity to respond to their concerns. I never received any formal

306    documentation from them addressing this issue. It is my belief that Mr. Coover did

307    not want me to function as a supervisor under his direction. Later, I was told by

308    Ralph Conner, GS-14, Mr. Doucet's predecessor, that Fred Coover told him that I

309    would never function as a supervisor as long as Coover was branch chief. Mr.

310    Conner said that he told Mr. Coover that if he didn't give me some supervisory

311    duties, Coover would be subject to complaints.

312         I strongly recommend Mr. Ralph Conner be interviewed as part of this

313    investigation.

314         It is my understanding that a GS-14 (who wanted to come to the New

315    Orleans area) was transferred in. It is also my understanding that an employee in

316    the AMID New Orleans office was promoted to a GS-14 Group Supervisor. Let it

317    be known that I was on the GS-14 Best Qualified List for that position. I was

318    passed over at least twice for selection. I believe, I was passed over because of

319    Mr. Coover's discriminatory and retaliatory attitudes toward me in which he

320    influenced management by his slanderous statements and innuendos about my

321    character (mentioned elsewhere in this document). I believe this is unfair.

322       I find it hard to believe that in our country's post-911 war on terrorism, my

323    position would suddenly not be needed in this area that is a major U.S. port. Mr.

324    Coover tries to justify this because in reality, he has prevented me from

325    performing the major duties of my position description as it pertains to supervisory

326    functions. He instead, chooses to focus on issues which were not at all in my

327    position description. He does this because of his discriminatory and retaliatory

328    actions in dealing with me. His personal prejudices and dislikes of me have

329    rendered him ineffective as a senior supervisor. He has wasted government

330    funds and taxpayers' dollars by refusing to utilize me, a supervisor, in the

331    functions, duties and responsibilities for which I was hired. Federal law enforcers

332    cannot be effective in this ongoing war against terrorism if allowed to engage in

333    internal disputes and prejudices that occupy the focus and in turn distort the main

334    objective and mission of the Service. I believe that one of the reasons the

335    President created the office of U.S. Homeland Security was to develop internal

336    unity among federal law enforcement professionals in the war on terrorism. Mr.

337    Coover's discriminatory and retaliatory actions against me and his personal

338    prejudices and dislike of me has threatened this by creating division and

339    dissension among employees in the Service.

340       **Question:** Are you aware of situations the same or similar to yours whereby

341    employees have encountered physical limitations while performing their job functions (for

Initials

(55)

342   the same or an equivalent amount of time as you), but were not given the option of a

343   directed reassignment? If so, please provide the name(s) and protected categories (race,

344   age, prior history of EEO activity) of the employee(s).

345          Response: My physical limitations did not interfere with my major job

346   functions. Management, particularly Fred Coover, chose to emphasize vessel

347   duty as a major job function in an effort to get rid of me. I was performing my

348   major job functions – with my physical limitations – and was rated 'Successful'.

349          Question: As it relates to the previous question and response, how does the

350   handling of your situation differ from that of other employees outside your protected

351   category?

352          Response: Since I was able to perform my major functions with my

353   physical limitations while achieving 'Successful' ratings, this question is not

354   relevant to my particular situation.

355          Question: How were you harmed when you were given the option of a directed

356   reassignment to the position of OSO in Washington, DC?

357          Response: I was harmed in that the move would have required me to

358   obtain new medical professionals to treat my injuries. My medical team consisted

359   of 4 highly trained specialists. They are all in the New Orleans area. Transfer of

360   care to the Washington area would have been very difficult and disruptive to my

361   medical condition. My confidence in my physicians and surgeons is critical

362   considering the seriousness of this spinal surgery. I have developed a trusting

363   professional relationship with my Psychiatrist. My medical team often confers on

Initials _R_

56

364   my diagnostic tests, treatments, etc. I experienced extreme anxiety and

365   depression at the thought of having to sever my ties with my medical team.

366       I was not able to accept the options cited in the directed reassignment

367   letter (mentioned earlier in this document). The options—particularly, that of

368   'resignation,' caused me considerable distress and depression.

369       Question: What specific evidence do you have to support your claim that your

370   national origin, your age and/or your prior involvement in the EEO process was taken into

371   consideration when you were presented with the option of a directed reassignment to the

372   position of OSO in Washington?

373       Response: The evidence described in this document and in my EEO and

374   OWCP case files regarding Fred Coover's discriminatory and retaliatory actions,

375   his defamation of my character and his influence on others in authority support

376   my claim that the directed reassignment was the end result of his actions.

377       I have always treated Fred Coover with respect due a senior supervisor,

378   even when I felt he discriminated and retaliated against me. I took initiative in my

379   work and followed instructions. I never raised my voice or used profanity when

380   speaking to Mr. Coover. Mr. Coover is non-Hispanic and the other SMEO GS-13

381   who held the position is non-Hispanic. Mr. Coover afforded this employee fair

382   and equal treatment. Mr. Coover allowed this non-Hispanic employee to perform

383   his supervisory duties without being forced by a prior EEO claim as was my

384   situation. Mr. Coover directly conferred with this non-Hispanic employee,

385   personally and in telephone calls often bypassing the direct line supervisor. I

386   believed Mr. Coover showed favoritism to this non-Hispanic employee because

Page 17 of 21                                                    Initials _____

                                                                      (57)

387  Mr. Coover never personally sought me out on work issues. In contrast, when I

388  held the position, Mr. Coover and those working on his behalf, often directly

389  contacted employees directly under my supervisor in an effort to avoid contacting

390  me.

391       Given all the evidence described here and described extensively in my

392  case files, Mr. Coover showed favoritism toward this employee who is also my

393  same grade level/job title. It should be noted that this employee is also younger

394  than I. It is obvious to me that Mr. Coover felt this younger employee had an age

395  advantage over me and that Mr. Coover felt he could "mold" or manipulate this

396  younger employee more to his liking than he could with me. I perceive Mr.

397  Coover to enjoy his seniority and superiority. Mr. Coover seemed intimidated by

398  me since I am closer to his own age than this younger employee to whom Mr.

399  Coover was so partial.

400       Please delineate the sequence of events that led up to your being asked to turn in

401  your credentials, badge, equipment, gear and employee manuals.

402       Response: Nicholas Doucet, acting on Fred Coover's behalf, asked me to

403  turn in my firearms, badge, credentials, gear, manuals and office keys before I

404  had even left for my medical leave of absence. I told Mr. Doucet that I may be

405  out for only a short time. I was disturbed by this. Later, he called me again,

406  asking for the same items. I asked him why he needed these items. He said it

407  was a regulation. I asked him to fax me a copy of the regulation. By this time, I

408  had learned not to trust anyone acting on Fred Coover's behalf. The regulation

409  he faxed did not discuss his need for my office keys and the return of my office

Page 18 of 21                                              Initials

410    desk items to me. An example of my reasoning is when female federal agents

411    are away on maternity leave, I do not believe they are all required to surrender all

412    the above mentioned items. I do not believe they surrender their office keys or

413    have their personal office/desk items delivered to them. These actions would

414    signal termination to any employee. I believe I was being singled out and treated

415    differently from all employees on medical leave. I challenge them to produce

416    documentation in which they obtained the above mentioned items from all

417    employees on medical leave as was done in my case.

418        Question: Who asked you to turn in your credentials, badge, equipment, gear and

419    employee manuals? When were you asked to turn these items in? When did you turn them

420    in? How were they turned in?

421        Response: I answered this question above.

422        Question: As it relates to the foregoing question, what reason(s) did Nicholas

423    Doucet give you for asking that you turn in your credentials, badge, equipment, gear and

424    employee manuals?

425        Response: I answered this question above.

426        Question: Why do you believe the reason(s) given by Nicholas Doucet for asking

427    that you turn in your credentials, badge, equipment, gear and employee manuals are

428    without merit?

429        Response: I answered this question above.

430        Question: At the time you were asked to turn in your credentials, badge, etc., what

431    was your work status? How long had you been in this status?

432        Response: I answered this question above.

Page 19 of 21

Initials

(59)

433     Question: On or about July 7 and 14, 2003 did Nicholas Doucet advise you of the

434     legacy U.S. Customs Service policy that dictates specific items, including, but not limited

435     to credentials, gear, weapons, equipment, etc., are to be turned in when an employee goes

436     on extended leave?

437     Response: I answered this question above.

438     Please respond to management's claim that the legacy U.S. Customs Service

439     policy is that employees will turn in their credentials, badge and weapon(s) and issued

440     equipment upon entering a leave without pay status for an extended undetermined period

441     of time. Why is this explanation without merit?

442     Response: I answered this question above. I have been in pay status

443     during the entire extent of my extended medical leave caused by my on-duty

444     injury. I do not believe Customs has acted on this for every employee who is on

445     extended leave, i.e female agents on maternity leave, and other employees.

446     Question: Were you ever instructed to comply with agency policy by coordinating

447     the surrender of your credentials, badge, weapon, equipment, etc., with local property

448     director, Maureen Cortez prior to going into extended leave status? If so, did you comply

449     with these instructions? If so, when did you comply? If not, why did you fail to comply?

450     Response: I answered this question above.

451     Question: How were the articles (credentials, badge, equipment, gear and

452     employee manuals) being used by you between the months of July and September (while

453     you were in non-work status)?

454     Response: The articles were not being used during this time. In

455     accordance with procedures, I kept the firearms, badge, and credentials in a

456     locked, fireproof safe during that time. I objected because I believed I was being

Page 20 of 21                                                    Initials _K_

(60)

457    singled out and treated unfairly, as mentioned in the narrative above.  I also

458    objected because I felt I was being terminated and gotten rid of.

459         Question: How were you harmed by being asked to turn in your credentials, badge,

460    equipment, gear and employee manuals?

461         Response: Mr Doucet was insistent on his request for all these items.  He

462    came to my home with two other uniformed agents to turn over my personal

463    desk/office items to me and to collect all the above mentioned items.  It seemed

464    to me as if I were being terminated and kicked out of my job and out of the

465    Service.  My wife and son were present.  I was humiliated and embarrassed by

466    this encounter.  My son admires me as his role model and I felt worthless in his

467    eyes, stripped of my dignity.  To add further embarrassment and humiliation, my

468    neighbors witnessed these three armed and uniformed individuals enter my

469    home.  After the trio left, my neighbors inquired about the episode, wondering if

470    there was some sort of "trouble."  It was a devastating experience.

471         Question: Are you aware of like or similar situations involving other employees

472    outside your protected categories that were treated differently, particularly, those you

473    believe were treated more favorably than you and/or were not asked to turn in their

474    credentials, badge, etc. under the same circumstances as you were asked to surrender

475    yours? If so, please provide the name(s) of those employees. State specifically how your

476    treatment differed.

477         Response:    I answered this question above.  In addition, I told Mr. Doucet

478    that I had not received any notice of transfer, trzavel documentation and

479    instructions.  I asked Mr. Doucet the name of my new supervisor.  Mr. Doucet told

Initials R

(61)

480    me he was still my supervisor.  If that were really the case, then why did Mr.

481    Doucet my "supervisor" not communicate his new office telephone numbers to me

482    since the office relocated?

483        Question: What specific evidence do you have to substantiate your claim that

484    Nicholas Doucet took your national origin, age and/or prior participation in the EEO

485    process into consideration when he asked you to turn in your credentials, badge,

486    equipment, gear and employee manuals?

487        Response:  As stated in my narrative above, I believe Mr. Doucet was

488    acting on Fred Coover's behalf and was influenced by Mr. Coover's discriminatory

489    and retaliatory actions, attitudes, and feelings toward me.  Mr. Coover is the

490    senior supervisor and Mr. Doucet answers directly to him.  This places Mr.

491    Coover in a position to influence Mr. Doucet.  Mr. Doucet has been well aware of

492    Mr. Coover's discriminatory and retaliatory actions toward me.  Upon leaving my

493    home that day, Mr. Doucet stated that he felt things would be much better for me

494    at the Branch after Mr. Coover was gone.  That statement speaks for itself.  My

495    wife and adult son were witnesses to this statement.

496        Question: Are you aware of other allegations of discrimination lodged against

497    Nicholas Doucet on the basis of national origin, age and/or retaliation? If so, please

498    delineate the details of the allegation(s).

499        Response: No, I am not.  However, Mr. Doucet was under direct influence

500    and supervision of Fred Coover.  Fred Coover then accepted a reassignment and

501    Mr. Doucet was in direct line for Mr. Coover's newly vacated position.  I believe

502    Mr. Doucet did not want to "make waves" that might jeopardize his career.


Page 22 of 21                                    Initials

                                                    62

503

504         There was no place provided in this document for my additional personal

505    statements. I wish to state that when the Air and Marine groups merged, I was

506    then placed under Mr. Coover supervision. He disliked me and discriminated

507    against me. He later reprised against me because I submitted the first EEO

508    complaint against him in hopes of getting relief from the hostile work environment.

509    After that complaint was thrown out because of a time factor, Mr. Coover then

510    elevated his discriminatory actions towards me to include reprisal and retaliation.

511    He systematically set our to destroy my career and my character. His continuous

512    refusal to afford me the opportunity to supervise and his constant defamation of

513    my character to my peers and senior supervisors was intolerable for me. The

514    directed reassignment was all part and result of this. He was ineffective as a

515    supervisor. His refusal to allow me to supervise was a gross waste of taxpayer's

516    dollars. It is counter-productive and a contradiction to the unity Homeland

517    Security strives to establish among Federal law enforcement.

518

519         **State your remedial relief:**

520         I am requesting $300,000.00 for each occurrence; non-economic

521    damages, retroactive promotion to GS-14, lost wages and benefits, retroactive

522    front pay and payment of all attorney's fees & costs and/or retroactive promotion

523    to GS-14 and immediate early retirement without penalties, lost wages and

524    benefits and payment of all attorney fees.


Page 23 of 21                                          Initials
                                                              (63)

Case 1:05-cv-01904-RJL    Document 9-2    Filed 03/31/2006    Page 24 of 24

525  I declare under penalty of perjury that the foregoing is true and correct to the best of my
526  knowledge.
527
528  Executed on  2/20/04          at New Orleans, Louisiana
529                (Date)                          (City/State)
530
531  Signature
532
533  Name: Ricky J. Rauch, Sr.
534
535  Title: Supervisory, Marine Enforcement
536
537  Officer
538
539  Address: 6064 Memphis Street
540
541  New Orleans, LA 70124
542
543

The DOL nurse and her supervisor should be interviewed. In an effort to keep me working, she called Fred Coover's office to see if there was any work for me. The answer she received was for me to get to Washington - there was work for me there.

Both the DOL nurse and her supervisor were surprised by this reply since my entire medical team is here in the New Orleans area.

My physicians were appalled at such arrogance and disregard for my medical condition.